IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

JAMES NIGHTENGALE                                                              PLAINTIFF

v.                                                          CAUSE NO. 1:13CV197-LG-JMR

STONE COUNTY SCHOOL DISTRICT
and DR. GWEN MILLER, Individually                              DEFENDANTS

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DR. GWEN MILLER'S MOTION TO DISMISS**

**BEFORE THE COURT** is Dr. Gwen Miller's Motion[1] to Dismiss [15] seeking qualified immunity and immunity pursuant to the Mississippi Tort Claims Act. The plaintiff James Nightengale has filed a response in opposition to the Motion, and Miller has filed a reply. After reviewing the submissions of the parties and the applicable law, the Court finds that the Motion should be denied to the extent that Miller seeks qualified immunity but granted in all other respects.

**FACTS**

Nightengale began working for the Stone County School District (hereinafter referred to as "the District") as a teacher and coach in August 2009. (Compl. at 2, ECF No. 1). He received emergency certification so that he would be qualified to teach students classified as having "mild to moderate special needs" at the middle school. (*Id.* at 2,3). In 2011, Nightengale ran as a Republican candidate in the election for District Superintendent. (*Id.* at 3). In August 2011, he defeated the

---

[1] At times, the Motion and Memorandum appear to also seek dismissal on behalf of Stone County School District, but the Motion and Memorandum were filed only on behalf of Miller. Therefore, the Court will not address the unsupported arguments relating to the District. The School District must file its own Motion.

middle school's Assistant Principal Anita Owens in the Republican primary. (*Id.*) Nightengale claims he experienced "an immediate change in [his] work environment," after he defeated Owens. (*Id.*)

In November 2011, the defendant Miller defeated Nightengale in the superintendent election. (*Id.*). Nightengale was reassigned to a special education class for "severe/profound special needs" students in April 2012 despite his objection that he was not qualified to teach the students. (*Id.* at 4-5). On July 19, 2012, he claims he informed the school principal that he might resign his coaching position, and she told him that he would need to resign in writing. (*Id.*) He claims he told the principal that he wanted to talk to his wife first and that he never actually resigned the coaching position. (*Id.*)

In July 2012, Nightengale learned that he was being reassigned to work with "severe/profound special needs" students at the high school, and the athletic department canceled his coaching membership. (*Id.* at 6). He informed the high school principal that he was not qualified to work with students who have "severe/profound special needs" and that his classroom was not properly equipped. (*Id.*) He claims that his complaints were never addressed. (*Id.*) He also informed the special education director that he was unqualified and uncomfortable working with the "severe/profound special needs" students, but she told him to "learn on the go" and ask other special education teachers for help with individual education plans for his students. (*Id.* at 7).

On August 24, 2012, Nightengale was asked to sign an amended contract that provided for a decrease in pay. (*Id.*) Miller claims that an amended contract was necessitated by Nightengale's alleged resignation of his coaching position. Nightengale refused to sign the amended contract, "because he already had a contract in effect at the time." (*Id.*)

Miller sent him a letter purporting to recommend termination for failing to sign the amended contract on January 25, 2013. (*Id.* at 8; Miller Aff. at 5, ECF No. 15-1). On February 21, 2013, Nightengale received a letter from Miller purporting to recommend his termination for violating a student's confidentiality and allowing a former special education teacher to assist with individual education plans for his students. (Compl. at 8, ECF No. 1; Miller Aff. at 34, ECF No. 15-1). He claims that all teachers who supported him during the election were terminated, forced to resign, or reassigned. (Compl. at 8, ECF No. 1). Miller claims that Nightengale was never formally terminated, but the District chose not to renew his contract at the end of the 2012-2013 school year.

Nightengale sued the District and Miller individually, claiming he was terminated for exercising his First Amendment rights by running for office against Owens and Miller and for voicing his concerns about problems within the District. (*Id.* at 9). He claims that the letters Miller sent him regarding termination were "pretextual." (*Id.* at 8). He also asserts due process and breach of contract claims against the District. (*Id.* at 9).

## DISCUSSION

In order to survive a motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements." *In re S. Scrap Material Co., LLC*, 541 F.3d 584, 587 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). In *Twombly*, the Court held that "heightened fact pleading of specifics" is not required, but "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555, 570. "When matters outside the pleadings are presented to and not excluded by the district court, the district court must convert a motion to dismiss into a motion for summary judgment." *Burns v. Harris Cnty. Bail Bond Bd.*, 139 F.3d 513, 517 (5th Cir. 1998).

Miller's Motion is styled as a Motion to Dismiss, but she provided an affidavit in support of the portion of her Motion pertaining to First Amendment retaliation. She also made arguments relating to summary judgment. Since Nightengale also provided evidence outside the pleadings, the Court finds that the First Amendment retaliation portion of Miller's Motion should be converted to a Motion for Summary Judgment.

A motion for summary judgment may be filed by any party asserting that there is no genuine issue of material fact that the movant is entitled to prevail as a matter of law on any claim.  Fed. R. Civ. P. 56.  The movant bears the initial burden of identifying those portions of the pleadings and discovery on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the movant carries its burden, the burden shifts to the non-movant to show that summary judgment should not be granted.  *Celotex Corp.*, 477 U.S. at 324-25.  The non-movant may not rest upon mere allegations or denials in its pleadings but must set forth specific facts showing the existence of a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

## I.  QUALIFIED IMMUNITY

"Qualified immunity shields a government official from liability based on his performance of discretionary functions."  *Haverda v. Hays Cty.*, 723 F.3d 586, 598 (5th Cir. 2013).  "To determine whether an official is entitled to qualified immunity, the court asks (1) whether the plaintiff has alleged a violation of a constitutional right, and (2) whether the defendant's conduct was objectively reasonable in light of the clearly established law at the time of the incident."  *Charles v. Grief*, 522 F.3d 508, 511 (5th Cir. 2008).  "Terminating an employee for engaging in protected speech . . . is an objectively unreasonable violation of an employee's First Amendment rights . . . ."  *Id.*

The Fifth Circuit has provided the following instructions for evaluating qualified immunity at the summary judgment stage:

> The qualified immunity defense is appropriate at the summary judgment stage when (1) a plaintiff has established that the defendant has engaged in the complained-of conduct, or (2) the court "skip[s] for the moment, over . . . still-contested matters to consider an issue that would moot their effect if proved." [*Baker v. Norman*, 651 F.2d 1107, 1124 (5th Cir. Unit A 1981)]. "If resolution of [qualified immunity] in the summary judgment proceedings turns on what the defendant actually did, rather than on whether the defendant is immunized from liability . . ., and if there are conflicting versions of his conduct, one of which would establish and the other defeat liability, then the case is inappropriate for summary judgment." [*Id.* at 1123-24]. Although summary judgment may be appropriate based on a plaintiff's inability to prove the facts essential to recovery, this "has nothing to do with the qualified immunity defense." *Id.*

*Haverda*, 723 F.3d at 599.

In her Motion, Miller argues that she did not violate a clearly-established Constitutional right of which a reasonable person would have known, because "[t]he clear, express motivation for the employment actions were plaintiff's failure to execute a contract as required for payment as an employee of the District, abandonment of his coaching duties and violation of established confidentiality requirements which plaintiff admits he violated." (Def.'s Mot. at 1, ECF No. 15). Therefore, Miller's Motion does not address the issue of whether retaliation for participation in an election is a constitutional violation. Rather, her Motion pertains to causation – that is, whether Miller recommended Nightengale's termination due to his speech or for the reasons proffered by Miller. *See Charles v. Grief*, 522 F.3d 508, 511-12 (5th Cir. 2008).

To prove First Amendment retaliation, a plaintiff must demonstrate: (1) that he experienced an adverse employment action; (2) his speech involved a matter of public concern; (3) his interest in commenting on matters of public concern outweighed the employer's interest in promoting efficiency; and (4) his speech motivated the adverse employment decision. *Haverda*, 723 F.3d at 591. Miller argues that the fourth element is lacking in the present case.

In an affidavit, Miller testifies that five other District employees ran against her for Superintendent. (Miller Aff. at 1, ECF No. 15-1). All of the other candidates continued to work for the District after Miller was elected in January 2012, and two of the candidates were promoted to better positions. (*Id.*) Miller states that Nightengale was initially recommended for termination pursuant to Miss. Code Ann. § 37-9-23,[2] because he refused to sign an amended contract within ten days after he resigned as coach. (*Id.* at 2-3). She relies on an unsworn statement written by the middle school's Head Football Coach Benjamin Bryan in which he claims that Nightengale failed to attend football practices and perform other coaching duties during the time surrounding the alleged resignation. (*Id.*) Before Nightengale's termination hearing was conducted, the District learned that Nightengale had given another employee, Kristi Dearman, access to a special

---

[2] Miss. Code Ann. § 37-9-23 provides, "If any . . . licensed employee . . . shall not execute and return the contract within ten (10) days after same has been tendered to him for execution then, at the option of the school board, the election of the licensed employee and the contract tendered to him shall be void and of no effect."

education student's confidential file on the District's Special Education Automated System. (*Id.* at 3). Miller states that Dearman was not authorized to view the student records, so Nightengale gave Dearman his username and password. (*Id.* at 3). Miller sent another letter recommending Nightengale's termination as a result of the alleged breach of student confidentiality. (*Id.*) The termination hearing was never conducted, but the District chose not to renew Nightengale's contract at the end of the 2012-2013 school year. (*Id.* at 3-4). Miller gives the following reasons for the actions taken concerning Nightengale's employment: (1) Nightengale resigned and abandoned his coaching duties; (2) Nightengale refused to execute an amended contract; and (3) he provided an unauthorized employee access to confidential student data. (*Id.* at 4).

In response to Miller's Motion, Nightengale has produced an affidavit in which he states that he had no disciplinary issues before he ran for the superintendent's position. (Pl. Aff. at 2, ECF No. 18-2). He claims that he was forced by Miller and others to resign his coaching position, and that Miller tendered his resignation to the School Board without his knowledge or approval. (*Id.*) He further explains that both his original contract and the amended contract he refused to sign were identical aside from a decrease in salary in the proposed amended contract. (*Id.*) Neither contract classified him as a coach. (*Id.*) He admits that he refused to sign the amended contract, and he admits that Kristi Dearman assisted him with student evaluations. (*Id.* at 2, 3). He claims that

Miller and the district "were setting him up to fail" by placing him in uncomfortable positions. (*Id.* at 3). He does not directly deny that he failed to attend athletic practices, but he generally claims he "performed [his] duties as requested." (*See id.*) Furthermore, he asserts that he "used the computer system no differently than any other employees and teachers." (*Id.*)

Nightengale also relies on an affidavit signed by his former co-worker, Kristi Dearman. (Dearman Aff. at 1, ECF No. 18-1). She claims that she worked for the District from 2002 until 2013, and that she had not been disciplined by the District until she supported Nightengale in the election. (*Id.*) A principal employed by the District warned her that "there could be negative repercussions for having a Jim Nightengale sign in [her] front yard." (*Id.*) She was transferred from the middle school to the elementary school approximately six months after Miller defeated Nightengale in the election. (*Id.* at 2). She also claims that other teachers who supported Nightengale were transferred within the District after the election. (*Id.*) Dearman testifies that Nightengale gave her his username and password so that she could assist him with student evaluations. (*Id.* at 3). She denies the District's assertion that this was a breach of student confidentiality, and she claims that she was the most qualified person to help Nightengale, because she was the counselor who last evaluated those students. (*Id.* at 2). She states that the special education director had previously provided her with a password so that she could assist the director, and neither she nor the director were punished for this. (*Id.* at 2-3).

Due to the conflicting affidavits provided by the parties, the Court finds that a genuine issue of material fact exists regarding whether Nightengale resigned his coaching position and, thus, whether he should have been required to sign an amended contract. The Court also finds that Dearman's affidavit creates a genuine issue of material fact regarding whether Nightengale's termination was at least partially motivated by his candidacy for superintendent and/or speech related to that candidacy. Specifically, Dearman stated that the special education director was not punished for giving Dearman the Director's password to the Special Education Automated System. Miller did not refute this testimony in her reply. If other employees committed the same offense that Nightengale committed but were not terminated or punished, a jury could determine that Nightengale's speech and/or candidacy must have motivated Miller's actions. *See Tompkins v. Vickers*, 26 F.3d 603, 608-09 (5th Cir. 1994) (holding that a plaintiff may support a claim of unconstitutional motive by relying on circumstantial evidence). As a result, Miller's Motion seeking qualified immunity and judgment as a matter of law concerning Nightengale's First Amendment retaliation claim is denied.

## II. THE MISSISSIPPI TORT CLAIMS ACT

Miller also seeks dismissal of any state law claims filed against her in the Complaint, because she was acting within the course and scope of her employment at all relevant times. *See* Miss. Code Ann. § 11-46-7(2). In response to the Motion, Nightengale claims that he filed a malicious interference with business relations claim against her, and, thus, Miller is not entitled to immunity under the

Mississippi Tort Claims Act. *See* Miss. Code Ann. § 11-46-5(2)

The Court has conducted a thorough review of the Complaint and found no reference to malice or interference with business relations in the Complaint. The only state law claim included in the Complaint is a breach of contract claim asserted against the District. However, to the extent that Nightengale attempted to plead a state law claim against Miller, the purported claim does not comply with Fed. R. Civ. P. 8(a)(2) and must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

## CONCLUSION

For the foregoing reasons, the Court finds that Miller's Motion should be denied to the extent that she seeks qualified immunity. The Motion is granted to the extent that Nightengale attempted to plead state law claims against Miller in her individual capacity.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that Dr. Gwen Miller's Motion to Dismiss [15] is **GRANTED** as to James Nightengale's purported state law claims and **DENIED** in all other respects.

**SO ORDERED AND ADJUDGED** this the 18th day of October, 2013.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
CHIEF U.S. DISTRICT JUDGE